2023 UT App 17

## THE UTAH COURT OF APPEALS

RAYNA ELIZABETH MINTZ,
Appellant and Cross-appellee,

*v.*

GLEN RYAN MINTZ,
Appellee and Cross-appellant.

Opinion
No. 20200507-CA
Filed February 9, 2023

Third District Court, Silver Summit Department
The Honorable Kent R. Holmberg
No. 174500034

Julie J. Nelson and Alexandra Mareschal, Attorneys
for Appellant and Cross-appellee

Thomas J. Burns and Aaron R. Harris, Attorneys for
Appellee and Cross-appellant

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGE GREGORY K. ORME and JUSTICE DIANA HAGEN concurred.[1]

MORTENSEN, Judge:

¶1 After a lengthy marriage, Rayna and Glen Mintz[2] divorced and have since been involved in ongoing litigation regarding the

---

1. Justice Diana Hagen began her work on this case as a judge of the Utah Court of Appeals. She became a member of the Utah Supreme Court thereafter and completed her work on the case sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 3-108(4).

2. Due to the parties' shared surname, we employ their given names.

distribution of marital property. Rayna and Glen now raise various issues for review, including questions about alimony, property distribution, and dissipation awards. In response to these appeals, we affirm in part, reverse in part, and remand to the district for further proceedings.

BACKGROUND[3]

¶2      Through more than twenty years of marriage, Rayna and Glen enjoyed a relatively luxurious lifestyle. During the marriage, in addition to meeting their regular expenses, Rayna and Glen invested money essentially as savings. Before 2014, they made deposits into investment accounts "when money was left over after normal marital spending," and after 2014, they made direct deposits into investment accounts as part of Glen's employment. Historically, they spent money freely, traveled frequently, and treated themselves to a variety of entertainment—often with other people. For Rayna's part, she often invited friends to join her on different jaunts across the globe or visits to the theater. For Glen's part, as is relevant to this appeal, he invested both time and substantial money into an extramarital affair.

¶3      Rayna and Glen financed this lifestyle through substantial income generated by Glen's employment as an investment advisor managing the assets and investments of various clients. As a salaried employee for his employer (Employer), Glen "did not sell . . . a client list to [Employer]"; instead, he expanded the clients he serviced by creating relationships with other employees

---

3. The parties are appealing an order from a bench trial. "We view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard. However, we present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *Kidd v. Kidd*, 2014 UT App 26, n.1, 321 P.3d 200 (cleaned up).

and assisting other employees in managing their clients' assets. As part of Glen's compensation, Employer offered cash awards distributed as forgivable loans. For each loan, Employer provided the cash to Glen up front and then forgave Glen's payback obligation each year, leaving Glen with a decreased payback obligation but an increased tax obligation. The cash awards were deposited directly into Glen and Rayna's investment accounts.

¶4    When Rayna discovered Glen's infidelity, the couple sought a divorce. Ultimately, the district court made several determinations relevant to this appeal. First, although Rayna would be awarded alimony, a monthly amount for investment would be excluded from the calculation because she presented insufficient evidence to show that the parties' investments were "standard practice during the marriage" or that they "helped form the couple's standard of living."

¶5    Second, although an amount for entertainment was included as a historical expense in alimony calculations, the court "divided by four" the amount Rayna had proposed because the entertainment amount was calculated based on a time "when two minor children also lived in the home."

¶6    Third, although the list of clients Glen serviced could be considered an asset, Glen did not own a "book of business," and accordingly, whatever value his client list contained could not be divided between the parties.

¶7    Fourth, although Glen had admitted to dissipating $75,000 on his extramarital affair and although the court determined that Rayna should be entitled to "half" that amount, in an appendix to the district court's findings of fact and conclusions of law, designating the specific property distributions, the court provided no amount in the space for money awarded to Rayna because of Glen's dissipation.

¶8     And fifth, although Rayna would receive what Glen argued was an investable property distribution, the court declined to include investment income in its alimony calculation because (1) the likelihood of a specific return was uncertain, (2) Rayna's investment income should be left unencumbered as was Glen's, and (3) the parties had traditionally reinvested investment income instead of living off it.

¶9     Following entry of the divorce decree, Rayna filed a motion to enforce, asserting that various investment accounts at issue in the divorce "were not divided immediately after trial and that they subsequently appreciated in value." Accordingly, Rayna sought an order requiring Glen to transfer holdings "equivalent to her proportionate share of appreciation since trial." However, before the hearing on that motion, Rayna filed a notice of appeal. At the hearing, the court determined that the enforcement order Rayna requested would require the court to not just enforce the order but to "read language into [the decree] and interpret [the decree] in a way that modifie[d] or amend[ed]" it. Because a notice of appeal had been filed in the case, the court determined it had been "divested of jurisdiction" to amend the decree and therefore could not provide the relief Rayna requested.

¶10    On these issues, Rayna and Glen both appeal.


ISSUES AND STANDARDS OF REVIEW

¶11    First, Rayna contends that the court abused its discretion through its award of alimony. Specifically, Rayna contends that (1) the court "misapplied Utah law" when it declined to award alimony consistent with historical investment and (2) the court entered unsupported findings of fact in reducing her entertainment expenses. "We review a district court's alimony determination for an abuse of discretion and will not disturb its ruling on alimony as long as the court exercises its discretion

within the bounds and under the standards we have set and has supported its decision with adequate findings and conclusions." *Gardner v. Gardner*, 2019 UT 61, ¶ 16, 452 P.3d 1134 (cleaned up). However, misapplication of the law is a de facto abuse of discretion, and an alimony award based on a misapprehension of the law will not be upheld. *See Bjarnson v. Bjarnson*, 2020 UT App 141, ¶ 5, 476 P.3d 145. Moreover, an alimony award based on clearly erroneous findings of fact will be overturned, *see Leppert v. Leppert*, 2009 UT App 10, ¶ 8, 200 P.3d 223, as will be an incorrect determination that evidence is insufficient to support an award, *see Kimball v. Kimball*, 2009 UT App 233, ¶ 14, 217 P.3d 733. "[U]nder our clearly erroneous standard, we will disturb a court's factual findings only where the court's conclusions do not logically follow from, or are not supported by, the evidence." *Gardner*, 2019 UT 61, ¶ 32.

¶12  Second, Rayna contends that the district court erred when it determined that the list of clients Glen managed as an investment advisor (the book of business) was not a divisible marital asset. "Determining and assigning values to marital property is a matter for the trial court," and an appellate court "will not disturb those determinations absent a showing of clear abuse of discretion." *Talley v. Talley*, 739 P.2d 83, 84 (Utah Ct. App. 1987).

¶13  Third, Rayna contends that the district court failed to award or reimburse her half of the amount that Glen dissipated. "Where the trial court's conclusions of law do not properly follow from the findings of fact, those conclusions can be overturned on appeal." *Cowley v. Porter*, 2005 UT App 518, ¶ 46, 127 P.3d 1224.

¶14  Fourth, Rayna contends that the court erred in determining, based on the divorce decree's language, that it lacked jurisdiction to grant Rayna appreciation on investment account awards. We review for correctness the district court's interpretation of a divorce decree, *Mitchell v. Mitchell*, 2011 UT

App 41, ¶ 5, 248 P.3d 65, and the district court's "determination on jurisdictional issues," *National Advert. Co. v. Murray City Corp.*, 2006 UT App 75, ¶ 11, 131 P.3d 872 (cleaned up).

¶15   Fifth, on cross-appeal, Glen contends that the district court abused its discretion when it did not "determine an amount of income that Rayna [would] be able to earn from her awarded investment account assets and . . . apply that income to her ability to pay for her marital standard of living." As indicated above, we review the district court's alimony determination for abuse of discretion. *See Gardner*, 2019 UT 61, ¶ 16.

ANALYSIS

I. Alimony

A.    Investment

¶16   Rayna contends that the district court erred in excluding from the alimony award an amount reflective of historical investment. Specifically, Rayna argues that the court misunderstood the phrases "standard practice" and "marital standard of living" as these phrases have been employed in Utah caselaw concerning the appropriateness of alimony awards that include amounts for investment or savings. Rayna argues that the parties made deposits into investment accounts as a standard practice that contributed to their marital standard of living, and she asserts that she should have received a higher alimony award to be able to continue this practice and maintain her standard of living. On appeal, we conclude that the district court erred in its application of the law on this point.

¶17   In *Bakanowski v. Bakanowski*, 2003 UT App 357, 80 P.3d 153, we indicated that "while the recipient spouse's need to fund post-divorce savings, investment, or retirement accounts may not

ordinarily be factored into an alimony determination, we cannot say that the ability to fund such post-divorce accounts may never be taken into account as part of" that analysis. *Id.* ¶ 16. Rather, "[t]he critical question is whether funds for post-divorce savings, investment, and retirement accounts are necessary because contributing to such accounts was *standard practice* during the marriage and helped to form the couple's *marital standard of living*." *Id.* (emphasis added); *see also Knowles v. Knowles*, 2022 UT App 47, ¶ 57 n.8, 509 P.3d 265; *Miner v. Miner*, 2021 UT App 77, ¶ 58 n.8, 496 P.3d 242. Thus, the court should, as a legal matter, ensure it employs the correct legal definitions of standard practice and marital standard of living, apply the facts of a given case to those definitions, and then determine whether the facts as found meet the criteria for a savings-based alimony award.

¶18 First, the district court erred in concluding that Rayna and Glen's undisputed course of conduct did not demonstrate a standard practice. *See Bakanowski*, 2003 UT App 357, ¶ 16; *Kemp v. Kemp*, 2001 UT App 157U, paras. 3–4, 2001 WL 522413. When the *Bakanowski* court provided the test for appropriate consideration of savings, investment, and retirement accounts in alimony calculations, it cited *Kemp v. Kemp*, in which the court reasoned that because "the parties had made *regular savings deposits*," including savings in the alimony award could help "maintain the recipient spouse's marital standard of living." *See* 2001 UT App 157U, paras. 3–4 (emphasis added).

¶19 An event must certainly be recurring but need not be uniformly systematic to be considered "regular." *See id.* at para. 3. Indeed, "something can be done 'regularly' if done whenever the opportunity arises, though the actual time sequence may be sporadic." *Youth Tennis Found. v. Tax Comm'n*, 554 P.2d 220, 223 (Utah 1976); *see also Allen Distrib., Inc. v. Industrial Comm'n*, 604 P.2d 938, 940 (Utah 1979) (reciting the then-enacted workers' compensation laws that provided that "regularly" could include employment "continuous throughout the year or for only a

portion of the year" (cleaned up)); *Holt v. Industrial Comm'n*, 87 P.2d 686, 689 (Utah 1939) (defining "regularly employed" to include "all employees who are employed and engaged in the usual or regular business of the employer, regardless of whether they were regularly or only casually or occasionally employed" (cleaned up)). Thus, even though an activity may "occur[] at intermittent times," it can still be a regular activity. *See Youth Tennis*, 554 P.2d at 223 (cleaned up); *see also B.L. Key, Inc. v. Utah State Tax Comm'n*, 934 P.2d 1164, 1166 (Utah Ct. App. 1997). And although "regular" could also be understood to require methodic uniformity, *see Valentine v. Farmers Ins. Exch.*, 2006 UT App 301, ¶ 11, 141 P.3d 618 (noting that "'regular use' connotes use that is consistent with a recurring pattern or uniform course of conduct or dealing" and that it "embodies use that is marked by a pattern of usage or some frequency of usage"); *Youth Tennis*, 554 P.2d at 223 (noting that "one of the meanings of the term 'regular' is: 'Steady or uniform in course, practice or occurrence'" (quoting Black's Law Dictionary 1450 (Rev. 4th Ed. 1968))), there exists no requirement that savings or investment deposits be made with uniform frequency.

¶20   Accordingly, even if savings deposits and investments do not occur on an exact timetable, such marital expenditures can be considered a standard practice, *see Bakanowski*, 2003 UT App 357, ¶ 16, in those infrequent and unusual circumstances where a party can produce sufficiently persuasive evidence that savings deposits and investments were a recurring marital action "whenever the opportunity ar[ose], though the actual time sequence may be sporadic." *See Youth Tennis*, 554 P.2d at 223; *see also Bakanowski*, 2003 UT App 357, ¶ 16.

¶21   The district court found that Rayna did not present "sufficient evidence" to show that contributing to savings and investment accounts was the standard practice during the marriage. But on appeal, neither party appears to dispute that the district court was presented with evidence that before 2014 the

parties invested substantial amounts of income at least yearly and that after 2014 a substantial portion of Glen's income was deposited directly into investment accounts at least yearly. Accordingly, for nearly a decade immediately preceding the divorce, the parties set aside substantial money for investments at least annually. This undisputed evidence established that the parties followed a regular pattern, i.e., a "standard practice," *see Bakanowski*, 2003 UT App 357, ¶ 16, of investing a portion of their annual income. In other words, given these undisputed facts, we conclude the district court applied too narrow a definition of standard practice in rejecting this evidence as insufficient.

¶22    Second, to justify an alimony award that includes an amount for investment, the parties' acts of investing must also contribute to the "marital standard of living." *Id.* "Standard of living is defined as a minimum of necessities, *comforts*, or *luxuries* that is essential to maintaining a person in customary or proper status or circumstances." *Howell v. Howell*, 806 P.2d 1209, 1211 (Utah Ct. App. 1991) (cleaned up) (emphasis added). In other words, in the alimony context, the marital standard of living is all that the parties enjoyed during the marriage—including luxuries and customary allocations—by virtue of their financial position. *See id.*; *see also Rule v. Rule*, 2017 UT App 137, ¶ 15, 402 P.3d 153.

¶23    In *Knowles v. Knowles*, 2022 UT App 47, 509 P.3d 265, the trial court refused to include tithing expenditures as part of the alimony calculation because it was "not a necessary living expense." *Id.* ¶ 57 (cleaned up). On appeal, we reversed that decision, explaining that it "ignored the requirement that [trial courts] assess the expense based on how the parties chose to spend and *allocate* their money while married." *Id.* (emphasis added). "By failing to assess whether the parties' expenditures were consistent with the marital standard of living, the court abused its discretion." *Id.*

¶24 The marital standard of living analysis is not merely a question about what the parties spent their money on or whether they spent it at all. Rather, in terms of alimony, the marital standard of living analysis is about whether the parties' proposed points of calculation are *consistent* with the parties' manner of living and financial decisions (i.e., the historical allocation of their resources). Something may contribute to the marital standard of living even though it may not result in a direct benefit or detriment to the marital estate's net worth.

¶25 Like the trial court in *Knowles*, the district court here did not fully consider how the parties chose to "allocate" their income. *See id.* The parties' choice to devote a substantial portion of income to investment and savings—much like the parties in *Knowles* chose to devote a substantial portion of their income to tithing, *see id.*—contributed to the parties' marital standard of living. The court should consider this evidence in determining the amount of investment and savings expenditures to include in its alimony calculations. *See id.*; *see also, e.g.*, *Lombardi v. Lombardi*, 145 A.3d 709, 716 (N.J. Super. Ct. App. Div. 2016) ("An appropriate rate of savings can, and in the appropriate case should, be considered as a living expense when considering an award of maintenance." (cleaned up)); *Bryant v. Bryant*, 534 S.E.2d 230, 232 (N.C. Ct. App. 2000) ("The trial court may also consider established patterns of contributing to savings as part of the parties' standard of living." (cleaned up)); *In re Marriage of Stenzel*, 908 N.W.2d 524, 536 (Iowa Ct. App. 2018) ("[R]etirement savings in a reasonable sum may be a part of the needs analysis in fixing spousal support.").

¶26 Below, the district court declared that "Rayna ha[d] not convinced the court that [the couple's] savings [practices] somehow helped form the couple's standard of living." The court continued, "There was no evidence that the deposits into the investment accounts were used to fund future purchases or otherwise contributed to the marital standard of living." In

making this ruling, the district court apparently relied on *Kemp*, where the court found that "during their marriage, the parties had made regular savings deposits to fund future major purchases, rather than making those purchases on credit." 2001 UT App 157U, para. 3. Including saved money in the "marital standard of living," however, does not require a party to spend it, as the parties did in *Kemp*. Our precedent does not exclude prudent saving from the definition of the marital standard of living. Indeed, it would be a perverse state of the law if we, as a rule, always included in an alimony calculation all sums parties spent, even imprudently, but excluded sums wisely saved.

¶27 The parties presented evidence (and on appeal the parties continue to agree) that the investments were meant to facilitate future financial growth; that during the economic recession in 2008, the parties dipped into their investments to maintain their standard of living; and that they later used investments to pay tax obligations incurred because of Glen's compensation structure. The very fact that such a substantial amount of Glen's income went straight to investment that then served to pay off a tax obligation represents the type of allocation that constituted part of the marital standard of living. An understanding of the marital standard of living that is restricted to direct and immediate expenses is simply too limited. Instead, the use of marital funds to cover the parties' investments and savings—provided it was standard practice during the marriage—is a proper consideration in determining the marital standard of living. *See Bakanowski*, 2003 UT App 357, ¶ 16.

¶28 In sum, the district court erred in concluding that insufficient evidence supported Rayna's request to include amounts for investment in alimony calculations. The undisputed evidence established that it was both a standard practice to invest marital assets annually and that this pattern of investment contributed to the marital standard of living. We remand the case to the district court to recalculate alimony based on the amount

that the couple's historical investment contributed to the marital standard of living. *See Bjarnson v. Bjarnson*, 2020 UT App 141, ¶ 5, 476 P.3d 145 ("We will reverse if the court has not exercised its discretion within the bounds and under the standards we have set." (cleaned up)).

B.     Entertainment

¶29     Rayna also contends that the district court "entered a factual finding that was unsupported by the evidence regarding [her] entertainment expenses." This is so, she argues, because testimony at trial established that the amount she originally requested for entertainment as part of her living expenses was "carved out . . . for her alone" and because the evidence, including the exhibit used to calculate her living expenses, did not otherwise suggest that the amount should have been reduced as it was by the district court. We agree that the district court's reduction of Rayna's entertainment expenses was based on clearly erroneous findings of fact because "the court's conclusions do not logically follow from" and are not supported by "the evidence." *See Gardner v. Gardner*, 2019 UT 61, ¶ 32, 452 P.3d 1134.

¶30     In determining the amount for entertainment expenses to include in its alimony calculation, the district court stated that the amount "presents expenses calculated for . . . years . . . when two minor children also lived in the home. Therefore, this amount should have been divided by four." The district court reduced the amount it considered in its alimony calculation related to entertainment accordingly. However, this does not follow from the evidence presented at trial.

¶31     As an initial matter, when asked about the entertainment line item, Rayna testified that she loved "to go to concerts," that she went "to New York City to the ballet [and] to the theater," and that she generally hosted a friend on those trips. And testimony from Rayna's expert on the matter explained that the amount was

for "entertainment that she would normally spend on a monthly basis" and, specifically, that the amount was "what she actually spent if . . . carved out [for] *her alone*." (Emphasis added.)

¶32 Glen attempts to provide support for the district court's apparently contrary finding by suggesting that several line items on Rayna's living-expense exhibit included a note that the amount was for "Rayna Only," and that based on this notation, the district court "acted within its appropriate discretion" when it determined the amount requested for entertainment should be reduced because that line item did not include that note. However, in our review of the exhibit referred to by Glen, of the thirty-nine line items listed, only three specify that the amount was for "Rayna Only." Yet some of the unmarked items reflect amounts the parties agree were spent on Rayna alone. Therefore, the absence of the "Rayna Only" notation does not necessarily reflect that those items were not for "Rayna Only." And further, a line item for "Money Spent on Kids" specifically notes that it includes "Entertainment" expenses for those children. If Rayna's entertainment expenses included money spent on the children, there would be no need to include a separate line item for entertainment under "Money Spent on Kids." Moreover, we note that the district court's determination that the amount should be "divided by four" because "two minor children also lived in the home" does not quite add up. Rayna and two children add up to three, and whether the court also included Glen or the friends Rayna often hosted is unclear from the court's findings of fact. Either way, the justification does not appear to support the reduction.

¶33 Accordingly, the district court's reduction of the alimony amount requested for entertainment contradicts not only the direct testimony at trial but also the very exhibit on which the court expressly based its findings. Because the court's conclusions do not logically follow from and are not supported by the evidence, we determine that this portion of the award is based on

clearly erroneous findings of fact, and we therefore remand to the district court for clarification and correction of the matter. *See Leppert v. Leppert*, 2009 UT App 10, ¶ 8, 200 P.3d 223; *Gardner*, 2019 UT 61, ¶ 32.

## II. Book of Business

¶34 Rayna next opposes the district court's determination that the book of business "was not a divisible marital asset." However, to prevail on such a contention, Rayna would need to show that the court clearly abused its discretion, *see Talley v. Talley*, 739 P.2d 83, 84 (Utah Ct. App. 1987), something she has not done here.

¶35 In dealing with Rayna's argument that Glen owned a book of business that should be a divisible marital asset, the district court first explained that the alleged book of business, comprising "a client list and the assets under management from these clients," constituted an "asset" as a legal matter—a determination neither party appears to challenge on appeal. But the court did not stop there, determining next that this "asset" was owned not by Glen but by Employer.

¶36 The court explained its reasoning in over five pages of detailed findings of fact and conclusions of law. Throughout those pages, the district court explained, among other things, that although Glen had extensive experience in his field and a portion of his compensation required him to meet lofty expectations concerning the funds he managed, "[w]hen Glen began work for [Employer], he did not sell a book of business or a client list to [Employer]"; "[n]owhere within [the relevant employment documents] did [Employer] indicate that it was purchasing any client list from Glen or that Glen was selling anything at all to [Employer]"; and "Rayna ha[d] not presented any evidence that Glen sold any client list, client information, or other asset to [Employer] as a condition of his hiring." Further, Glen "worked as an employee of [Employer]"; "ha[d] been paid a salary . . . as a

W-2 employee"; and "expand[ed] the client list" by, in part, "creat[ing] relationships with other . . . employees who advise individuals that they service to place assets under Glen's management." The court then noted that often "Glen manages assets owned by numerous individuals and entities with whom he has no personal relationship."

¶37 The court then described various agreements concerning Glen's compensation and employment and highlighted portions of those agreements. One read,

> All information concerning [c]lients of [Employer], former clients of [Employer], and prospective clients of [Employer] must be treated as confidential and must not be disclosed to anyone outside of [Employer.] . . . [I]n the event Employee's employment is terminated for any reason whatsoever[,] Employee may not take any records or information referring or relating to [c]lients of [Employer], former clients of [Employer] and prospective clients of [Employer], whether originals or copies, in hard copy or computerized form.

Another read,

> Employee may not directly or indirectly use, maintain, take or disclose any Confidential Information, except . . . in the course of carrying out Employee's duties for [Employer] during Employee's employment[.] . . . "Confidential Information" . . . includes . . . client relationships and prospective client relationships, client lists and contact information, client information (including but not limited to clients' past and present financial conditions, investment practices, preferences,

> activities, objectives, and plans and other client data Employee obtained while in [Employer's] employ)[.] . . . Employee further expressly agrees that, in the event his or her employment terminates, Employee's use of Confidential Information, including but not limited to any information referring or relating to clients of [Employer], former clients of [Employer] and prospective clients of [Employer], must immediately cease and that Employee must immediately return, destroy or delete, any Confidential Information whether in hard copy or computerized form, including in any electronic device owned by Employee.

The court then reasoned, "[i]f the clients were clients, relationships, or contracts that Glen owned, he would not be subject to any restrictions with respect to the manner in which he stored, maintained, or utilized any of the client information, either during or after his employment with [Employer]. Similarly, if the client information was owned by Glen, he would not be subject to any restrictions." Significantly, the court noted that "individuals and entities that own the assets under management have no contractual obligation to continue to use Glen to manage their assets; they are free to select a different . . . adviser [of Employer] at any time." These individuals had "not contracted with Glen" but instead had "contracted with" Employer. And finally, the court reasoned that "[t]he terms Glen was offered by [Employer] were not negotiated. He did not negotiate higher pay or different terms but simply accepted employment on the terms offered by [Employer]. If Glen owned the book of business[,] he would have been in a position of greater leverage and been able to negotiate with [Employer]." In short, the district court determined that because Glen's interactions with the book of business did not demonstrate ownership, "Glen [did] not own the book of business."

¶38 Rayna attacks this determination primarily based on the alleged existence of alternative evidence. First, she asserts that evidence that Glen had some control over the book of business and its fruits and that the book of business included the information of some clients he had obtained before joining Employer demonstrated that Glen owned the book of business. But regardless of whether such evidence was before the district court, it would not contradict the findings the court did make—findings on which it relied to determine that, on the whole, Glen did not own the book of business. And although Rayna contends that "the evidence showed that [Employer] hopes to buy Glen's book of business when he retires or transitions out of the industry and would facilitate the transfer of all of his clients to another advisor within [Employer]," this argument fails to acknowledge that the district court specifically considered this evidence in its findings of fact and ultimately found that the evidence did not deserve "any weight" because of a "lack of any testimony or other evidence by anyone who actually knew anything about" such a buy-out program. Indeed, "if there is evidence supporting a finding, absent a legal problem—a fatal flaw—with that evidence, the finding will stand, even though there is ample record evidence that would have supported contrary findings." *See Hinds v. Hinds-Holm*, 2022 UT App 13, ¶ 28 n.4, 505 P.3d 1136 (cleaned up). And here Rayna has not demonstrated that such a flaw exists.

¶39 Because none of Rayna's arguments on appeal show that the court clearly abused its discretion in its thorough and record-supported explanation of why Glen did not own the book of business, her contention on appeal is unavailing and we affirm the district court's determination.

### III. Dissipation

¶40 Rayna also contends that the district court erred when it included in the final distribution only half of the amount it determined Glen dissipated and failed to award Rayna any of it.

Indeed, the district court found that "the amount of dissipation attributable to [Glen's affair] is $75,000" and that "[t]hese funds were marital funds, for which Glen was entitled to half and Rayna to half." But in the next line, the court, in seeming contradiction, stated, "Through dissipation, Glen spent half of $37,500 which Rayna was entitled to and therefore should be added to Glen's [distribution] column."

¶41    On appeal, the parties agree that Rayna is owed $37,500 due to Glen's dissipation of $75,000. But the parties do not agree about the meaning of the court's order or its associated appendix distributing the marital property. Having viewed both the court's order, as recited above, and the appendix that purports to effectuate that order, we remand this issue to the district court for clarification.

¶42    Because the parties agree that the full amount of dissipation is $75,000 and that Rayna is thus entitled to $37,500, the only matter for us on appeal is to ensure that the order of the district court reflects that agreement. And it does not appear to do so. The court's appendix lists three columns: one for the value of a given property item, one for Rayna's portion of the property, and one for Glen's portion of the property. In Rayna's and Glen's respective columns, a number was entered without parentheses to indicate a positive sum owed to the party, and a number was entered inside parentheses to indicate a sum to be subtracted from the ultimate distribution. For the line-item entry for dissipation, instead of $75,000, the value was listed as only $37,500. More important for our present purposes, Rayna's column for that line item is empty whereas Glen's contains $37,500 without parentheses, indicating a positive sum. As we read this entry, it appears that the incorrect dissipation amount was entered into the value, and instead of Rayna being awarded half of that $75,000, the amount of $37,500 was given to Glen. This was error.

¶43    On remand, the district court should correct this error and the associated appendix to indicate without ambiguity that the full amount of dissipation is $75,000 and that Rayna will be awarded $37,500 as her share of that total.[4]

### IV. Property Distribution Appreciation

¶44    Rayna lastly contends that the district court "abused its discretion when it refused to award [her] a proportional share of the appreciation that accrued on the marital investment accounts" as she requested in her motion to enforce. She asserts that the court mischaracterized her motion to enforce as a motion to amend and that it accordingly erred in determining that it lacked jurisdiction to provide the relief she requested. On appeal, Rayna appears to maintain that her motion below was nothing more than a motion to enforce the decree; that the court had jurisdiction to enforce its decree; and that in determining that the order she requested would require an amendment (as opposed to mere enforcement), the court inherently "determined the decree did not already offer Rayna a proportional amount of the appreciation." We agree with the district court that the relief Rayna sought would have required an amendment to the decree and that the court did not have jurisdiction to amend that decree once the notice of appeal had been filed.

¶45    We note that a "trial court is [generally] divested of jurisdiction upon the filing of an appeal." *Ortiz v. Crowther*, 2017 UT App 133, ¶ 2, 402 P.3d 34 (per curiam). But a court may still

---

4. The district court's view, which we endorse, is that Glen spent $75,000 in marital funds on his affair—not a proper marital purpose. Half of that amount was essentially his, but the half belonging to Rayna should properly be restored to her by Glen.

enforce its decree even if an appeal has already been sought.[5] *See Cheves v. Williams*, 1999 UT 86, ¶ 48, 993 P.2d 191. Accordingly, because "Rayna filed a motion to *enforce* the decree," she asserts that the court should have reached the merits of the issue she presented to it. But "[t]he substance of a motion, not its caption, is controlling." *DeBry v. Fidelity Nat'l Title Ins. Co.*, 828 P.2d 520, 523 (Utah Ct. App. 1992). And here, although Rayna titled her motion as one "to enforce," the requested relief does not match that title. *Cf. CBS Enters. LLC v. Sorenson*, 2018 UT App 2, ¶¶ 11–12, 414 P.3d 925.

¶46   The decree instructed Glen "to 'transfer' equities valued at the *exact amounts* set forth." (Emphasis added.) But in her motion, Rayna requested not only those exact amounts but also "post-trial appreciation over and above the exact figures set forth." On appeal, Rayna concedes that "the decree said nothing about who should receive the appreciation that accrued" post-trial. Accordingly, we agree with the district court that to award the relief that Rayna sought would require the district court to "read language into" the decree "in a way that modifie[d] or amend[ed]" it. *See Mitchell v. Mitchell*, 2011 UT App 41, ¶ 5, 248 P.3d 65 ("We interpret a divorce decree according to established rules of contract interpretation." (cleaned up)); *see also Brady v.*

---

5. Notwithstanding this general rule, the lower court may, in addition to dealing with motions to enforce the decree address clerical errors and other mistakes "arising from oversight or omission" that the appellate court asks it to address even after an appeal has been filed. *See* Utah R. Civ. P. 60(a); *see also Cheves v. Williams*, 1999 UT 86, ¶ 45, 993 P.2d 191 ("We have also recognized exceptions to [the general] rule, in the interest of preventing unnecessary delay, where any action by the trial court is not likely to modify a party's rights with respect to the issues raised on appeal, or where the action by the trial court is authorized by rule or statute." (cleaned up)).

*Park*, 2019 UT 16, ¶ 53, 445 P.3d 395 ("If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language . . . ." (cleaned up)).

¶47   Because Rayna filed her notice of appeal before the district court ruled on her request for post-trial appreciation of the investment distribution, the district court had been divested of jurisdiction to alter the divorce decree in the way Rayna requested. *See Ortiz*, 2017 UT App 133, ¶ 2. Accordingly, we affirm the district court's determination.

### V. Investment Income

¶48   On cross-appeal, Glen contends that the district court abused its discretion when it did not include in its alimony calculation an amount reflecting Rayna's ability to earn income from awarded investment accounts and apply that amount toward Rayna's unmet needs.[6] Initially, Glen asserts that the district court "fail[ed] to consider Rayna's ability to earn" income from these sources, but in the remainder of his argument, he proceeds to explain why the court's actual consideration of her ability to earn income from investment accounts is based on unsupported findings or is otherwise unjustified.

¶49   For its part, the district court acknowledged Glen's argument that Rayna would receive an investable property distribution that could provide "at least" a six percent return. While Utah "caselaw directs district courts to *consider* all sources of income when determining alimony, it does not dictate that all sources of income be *counted* as income received"—instead district courts have "broad discretion to treat sources of income as

---

6. Although the district court did not impute income to Rayna based on investment earnings, it did impute to her some income based on an undisputed amount of earning capacity.

the court sees fit under the circumstances." *Eberhard v. Eberhard*, 2019 UT App 114, ¶ 21, 449 P.3d 202. The court then provided three justifications for its determination that "it would be inequitable to include interest, dividend or other unearned income potentially generated from investment assets received in the marital property award."

¶50 First, the court explained that the "ability to obtain a 6% return is not sufficiently certain for the court to rely on." It noted the inconsistency of historical returns, Rayna's discretion to use her distribution for purposes other than investment, and the difficulty of projecting future investment income. Second, the court explained that "[i]t would be inequitable for Glen to be able to keep his share of the investments and retain their income stream to reinvest as he continues to generate professional income, while Rayna would retain only the investments after being compelled to expend her investment income to pay her living expenses." The court felt that such an order would "wrongly deprive[] Rayna of the full benefit and value of" her distribution and that she should be able to "grow" any investments she would make without the obligation to use that money for providing for her own standard of living. Third, the district court explained that "[i]t was the parties' regular practice not to spend or live off investment income, but rather to entirely reinvest that income." Accordingly, the court refrained from applying any amount of potential investment income toward Rayna's projected earning capacity.

¶51 In determining whether a spouse should receive alimony, the general rule is that a court should first take care of property distribution. *See Batty v. Batty*, 2006 UT App 506, ¶ 5, 153 P.3d 827 ("[An alimony] evaluation properly takes into account the result of the property division, particularly any income-generating property [the receiving spouse] is awarded, but alimony is not meant to offset an uneven property award. Rather, as a matter of routine, an equitable property division must be accomplished

prior to undertaking the alimony determination."). Then, depending on how the property distribution works out—especially considering income-generating property—the court considers whether alimony will be necessary for a spouse to meet demonstrated needs. *See Burt v. Burt*, 799 P.2d 1166, 1170 (Utah Ct. App. 1990) ("Alimony is appropriate to enable the receiving spouse to maintain as nearly as possible the standard of living enjoyed during the marriage and to prevent the spouse from becoming a public charge." (cleaned up)); *see also Batty*, 2006 UT App 506, ¶ 4 ("In determining alimony, the trial court must consider three important factors: (1) the financial condition and needs of the spouse claiming support, (2) the ability of that spouse to provide sufficient income for him or herself, and (3) the ability of the responding spouse to provide the support. Although a trial court is given considerable discretion in determining an alimony award, failure to consider these factors constitutes an abuse of discretion." (cleaned up)). And as we held in *Eberhard v. Eberhard*, 2019 UT App 114, 449 P.3d 202, while the district court must *consider* all potential sources of income, it is not required to *count* those sources of income. *Id*. ¶ 21. This is nothing more than an expression of the rule that a district court has "broad discretion to treat sources of income as the court sees fit under the circumstances." *Id*.

¶52　Here, contrary to Glen's assertion, the district court did, in fact, consider Rayna's ability to earn income from her distributed investment assets in reaching its determination that she would still require additional alimony to support herself to the level of the marital standard of living. *See Dobson v. Dobson*, 2012 UT App 373, ¶ 21, 294 P.3d 591 (stating that for the purposes of determining alimony, "the needs of the spouses are assessed in light of the standard of living they had during marriage" (cleaned up)). Given that the district court considered Rayna's ability to earn income in reaching its determination that she was entitled to alimony, the question before us is whether the circumstances

allowed the district court to refrain from counting any future investment income Rayna may receive in its calculation. None of Glen's arguments attacking the court's determination persuade us that the court exceeded its discretion here.

¶53 First, Glen argues that the court's determination that the "ability to obtain a 6% return is not sufficiently certain for the court to rely on" contradicts its other findings. Specifically, he cites a finding that states "Glen's income has consistently increased" and "[o]ther than general economic uncertainty, there was no evidence at trial that this trend would not continue." He then claims that this statement contradicts the court's determination that Rayna would not obtain a return on her investments.

¶54 However, the two findings are not comparable at their roots. Regarding Rayna's potential income, the court was specifically discussing income resulting from a return on investments; but regarding Glen's income, the court was noting an increase in his income as a whole, including that income derived from gainful employment and not exclusively income derived from any returns on Glen's ongoing investments. A projection that Glen's income as a whole, salary and all, will continue to increase is not incompatible with a determination that a return on investment income is insufficiently certain to rely on.

¶55 As part of this argument, Glen also characterizes an unrelated finding from the court's ruling as a determination that Rayna's relevant accounts were "not easily liquidated" and asserts that the court's statement that Rayna may choose to liquidate a portion of these investments contradicts that finding. But this description of the court's finding is simply inaccurate—the court noted that the "accounts [were] not liquid," and it made no statement about whether there would be difficulty in liquidating them. And even if the accounts were difficult to liquidate, it would, again, not be incongruous with the court's

other findings, specifically that Rayna *could* choose to liquidate, any difficulty notwithstanding.

¶56   Further, Glen asserts that the court unjustifiably determined that both parties should "grow" their investments but that growth on Rayna's accounts was uncertain. Again, these findings are not incongruous—the district court could reasonably find that a return was uncertain, that requiring Rayna to use any return to provide for her needs would prevent her from increasing the amount invested, and that Rayna deserved the opportunity to have her investment returns be reinvested for potential future growth.

¶57   Second, Glen asserts that the court gave Rayna freedom to reinvest her investment returns while it restricted Glen to using his investment returns to pay for both the taxes owed on his forgiven loans and Rayna's alimony award. As to the alimony award, we note that Glen has not directed us to anywhere in the record where the district court explained that he must pay for Rayna's alimony using investment income, and as such, Glen is free to provide for Rayna's alimony using whatever resources he desires, whether it be his salary, proceeds from a mortgage or other loan, or, indeed, his investment income.

¶58   Third, Glen asserts that the court's finding that "[i]t was the parties' regular practice not to spend or live off investment income, but rather to entirely reinvest that income" contradicts its acknowledgment that Glen incurred a tax obligation from the forgiven loans. However, we note that although Glen maintains on appeal that he used the forgivable-loan investment returns to pay tax obligations, Glen has not pointed to the court ever making a finding to that effect, and thus the findings are not inconsistent. Further, although such evidence was before the court, the court also stated that "Glen did not include his own investment income in his Financial Declaration as income available to pay alimony or to otherwise meet his own need." That fact, the court stated,

"demonstrate[d] that neither party considered investment income as income to be spent or expended, but rather as a vehicle to increase savings and net worth." While a pattern of using investment returns to pay tax obligations may not be completely compatible with a pattern of using returns to "increase savings and net worth," we do not view this apparent inconsistency as enough to persuade us that the court abused its discretion.

¶59    In sum, Glen has not demonstrated that the court abused its discretion in refusing to count Rayna's potential investment returns as income toward her ability to meet her living expenses. Accordingly, we affirm the district court on this point.

CONCLUSION

¶60    First, we remand to the district court to apply the correct standard to the evidence regarding investments and savings and to adjust the alimony award based on calculations that account for Rayna's historical spending on future investments; we also remand to the district court to adjust the alimony award based on calculations that account for Rayna's historical spending on entertainment. Second, we affirm the district court's determination that Glen did not own the book of business. Third, we remand to the district court to ensure that Rayna is awarded the $37,500 owed to her due to Glen's dissipation. Fourth, we affirm the district court's determination that the relief Rayna requested in her motion to enforce would have required it to amend the decree and that it lacked jurisdiction to do so. And fifth, we affirm the district court's decision not to include potential investment income in calculating Rayna's actual income. On remand, we instruct the district court to engage in further proceedings as necessary to effectuate the holdings provided in this opinion.

———————