2023 UT App 86

# THE UTAH COURT OF APPEALS

JARED M. KNIGHT,
Appellee,
*v.*
REBECCA B. KNIGHT,
Appellant.

Opinion
No. 20210080-CA
Filed August 10, 2023

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 184902185

Julie J. Nelson, Taylor Webb, and Stephen C. Clark,
Attorneys for Appellant

Bart J. Johnsen and Alan S. Mouritsen,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN D. TENNEY and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1     After a trial on cross-petitions, the district court entered findings of fact and conclusions of law and a final decree divorcing Rebecca and Jared Knight. Rebecca[1] appeals several aspects of the divorce decree, including the court's determination that she had no interest in a trust Jared's father established before the marriage and several of the court's calculations related to alimony. We affirm the district court's ruling with respect to

---

1. Because the parties share the same last name, we refer to them by their first names, with no disrespect intended by the apparent informality.

Jared's trust, and we affirm in part and reverse in part with respect to the alimony calculations.

## BACKGROUND

¶2     In October 1994, Jared's father, L. Randy Knight, created the RKF Jared M. Knight Trust (the Trust), an irrevocable trust. Randy named Jared as the sole beneficiary of the Trust and transferred a significant interest in RKF, LLC—an Arizona limited liability company formed in 1994 by Randy—to the Trust. The trust agreement for the Trust (Trust Agreement) specified that the Trust would be governed by Arizona law. The Trust Agreement also contained a "spendthrift provision" declaring that Jared lacked the "right to assign, transfer, encumber, or hypothecate his . . . interest in the principal or income of the [T]rust in any manner." Additionally, the Trust Agreement granted Jared a power of withdrawal over the Trust principal such that Jared could withdraw up to one-fourth of the principal at age 30 (June 2002), up to one-third of the principal at age 35 (June 2007), and all the principal at age 40 (June 2012). To exercise this power, Jared would need to make "a request in writing."

¶3     In October 1995, Jared and Rebecca were married. During their marriage, the parties enjoyed a lavish lifestyle funded, in part, by the wealth of Jared's family.

¶4     In March 2008, Rebecca and Jared executed a "Property Agreement" (the Property Agreement), which stated, "All property which is now owned by JARED or by REBECCA, individually, . . . is hereby declared to be, and hereby is, the community property of JARED and REBECCA." The Property Agreement specified that "to the extent necessary, JARED and REBECCA each hereby gives, grants, conveys and assigns to the

other an interest in his or her property . . . so as to transmute[2] such property into the community property of JARED and REBECCA." The Property Agreement further declared, "All property hereafter acquired by JARED and REBECCA, or either of them, . . . shall be deemed to be, and hereby declared to be, the community property of JARED and REBECCA." However, the Property Agreement carved out an exception: "Notwithstanding the foregoing, any property received by JARED and REBECCA by gift or inheritance after the date of this [Property] Agreement shall be the sole and separate property of the person receiving it, unless that person declares otherwise in writing." The Property Agreement is, like the Trust, governed by Arizona law.

¶5      In 2016, the Trust was decanted[3] into a new trust. The new trust named Jared as sole initial trustee and therefore permitted Jared to distribute to himself, "upon his written request, up to the balance of the principal of his trust at any time."

¶6      In April 2018, Jared filed for divorce. Rebecca ultimately filed an amended counterclaim alleging that the principal of the Trust was marital property and therefore subject to equitable distribution under the terms of the Property Agreement.

¶7      Jared filed a motion for partial summary judgment on this point, arguing that the Property Agreement "did not transmute

---

2. "Transmutation" is a "change in the nature of something; [especially], in family law, the transformation of separate property into marital property, or of marital property into separate property." *Transmutation*, Black's Law Dictionary (11th ed. 2019).

3. To "decant" is "[t]o distribute (the assets of an irrevocable trust) to the trustee of a new trust with different provisions, often to correct drafting errors or to account for new circumstances." *Decant*, Black's Law Dictionary (11th ed. 2019).

assets held by the [Trust]" into marital property. Jared asserted that the Property Agreement did not apply to the Trust because, at the time he entered into the Property Agreement, he did not own the Trust principal under Arizona law. He pointed to the statute in effect in 2008—the year the parties entered into the Property Agreement—which stated that "if the trust instrument provides that a beneficiary's interest in principal is not subject to voluntary or involuntary transfer, the beneficiary's interest in principal shall not be transferred." Ariz. Rev. Stat. Ann. § 14-7702(a) (2008). The statute further specified that a court may not order the satisfaction of a money judgment against a beneficiary until "[a]fter an amount of principal becomes immediately due and payable to the beneficiary." *Id.* § 14-7702(b). It explained that "[i]f an amount of principal is due and payable only at a future date, or only on the occurrence of a future event, whether the occurrence of that event is within the control of the beneficiary, the amount of the principal is not immediately due and payable to the beneficiary." *Id.* Jared asserted that the Trust's "disbursement mechanism squarely fit[] within the framework of Arizona Revised Statute Section 14-7702(B) as it was written in 2008" because the Trust's requirement that Jared submit a written request for disbursement of the Trust principal rendered the principal "not immediately due and payable." *See id.* And Jared argued that, because he never submitted a written disbursement request or withdrew any principal of the Trust, "[a]s a matter of Arizona law as it existed at the time that the Property Agreement was executed in 2008, no amount of the Trust principal is 'now owned' or 'hereafter acquired'" by Jared, so the Property Agreement did not apply to the Trust.

¶8   Rebecca opposed Jared's motion and filed her own motion for partial summary judgment. Rebecca argued that Jared's beneficial interest in the Trust was a property interest that Jared owned at the time of the Property Agreement. She also asserted that Jared's power of withdrawal gave him an ownership interest in the Trust principal that he was eligible to withdraw as of the

date of the Property Agreement. She said, "Consistent with the common understanding of 'property' as comprising a set of rights (a 'bundle of sticks' in the law-school formulation), if among those rights a person has the right to control the disposition of an asset, that asset is his property, and he has ownership of the property." Rebecca further avowed that "[t]he Arizona statute on which Jared relies . . . has nothing to do with the question before this [c]ourt" because it applies to "the rights of 'creditors' to access property held in trust for a beneficiary when the trust features a 'spendthrift' clause" and Rebecca was not a creditor. Accordingly, Rebecca claimed that the Trust's spendthrift clause "did not limit Jared's ability to transmute his property interest in the Trust or its underlying assets into community property, and he plainly did so by signing the Property Agreement." Rebecca argued that the Restatement (Third) of Trusts instead applied and made it "clear that trust assets subject to an exercisable power of withdrawal are 'property.'" (Citing Restatement (Third) of Trusts § 56 cmt. b. (Am. L. Inst. 2003) ("Trust property subject to a presently exercisable general power of appointment (a power by which the property may be appointed to the donee, including one in the form of a power of withdrawal), because of the power's equivalence to ownership, *is treated as property of the donee*." (emphasis added))).

¶9    The court denied Rebecca's motion for partial summary judgment and granted Jared's. The court reasoned that "the legal position taken in [t]he Restatement (Third) of Trusts § 56 was not the law in Arizona until 2009, when it [was] partially codified as part of the Arizona Trust Code," and it rejected Rebecca's argument that "the spendthrift clause specifically disengages for purposes of the exercise of a power of withdrawal [and] expressly allows a trustee to transfer withdrawn property to a beneficiary." The court determined, instead, that Arizona Revised Statutes section 14-7702 applied because—regardless of whether Rebecca was a "creditor"—"that statute . . . define[d] when an amount is due and payable and separately define[d] the rights of creditors."

Accordingly, the court concluded that "[n]o amount of the Trust principal is due or payable within the meaning of that statute, and it is therefore protected against . . . the disbursement sought by [Rebecca]." The court thus ruled that because Jared's interest in the Trust principal was "not subject to voluntary or involuntary transfer," *see* Ariz. Rev. Stat. Ann. § 14-7702(a) (2008), it could not be transferred through the Property Agreement.

¶10 The parties then proceeded to trial on the other issues involved in their divorce, including distribution of the marital estate and alimony. The district court entered its order, later entering its findings of fact and conclusions of law and issuing the divorce decree. As relevant to this appeal, in its alimony calculations, the court made several reductions to Rebecca's claimed expenses.

¶11 First, the court made several modifications to the expenses Rebecca submitted related to home maintenance. The court eliminated the snow removal expense of $175 per month, stating, "The parties never paid for snow removal during the marriage[,] and this expense was not part of the marital [lifestyle]." It eliminated the monthly "[p]ool/[s]pa maintenance" expense of $373.33, reasoning that "[t]he parties did not have pool maintenance expense[s] during the marriage as the pool was maintained by the parties" and "[t]his new expense was only incurred after separation and because [Rebecca] is not cleaning the pool despite acknowledging she is capable of doing so." And it eliminated the monthly landscaping expense of $414.66 because "[t]his was not an expense that was incurred during the marriage as the yard work was done by the parties themselves." It continued, "[Rebecca] further acknowledged that she is capable of yard work. Also, [Jared] has not requested that he [have] third parties do his yard maintenance."

¶12 Next, the district court modified several of Rebecca's expenses related to health and personal care. It reduced Rebecca's

health care insurance expense from $757 per month to $411 per month, explaining,

> [Rebecca] is not incurring this expense but is covered under the parties' current policy. In addition, no written evidence was provided as to the costs for health care coverage for [Rebecca]. [Rebecca] acknowledged the $757 was for a policy with no deductibles[,] which is not the same level of policy the parties currently have in place, which has [an] $8,000 a year deductible. Further, the [c]ourt has received evidence in other cases that health care coverage for a single person can be obtained in the $400 to $500 a month range. Therefore, the [c]ourt adjusts [Rebecca's] coverage to be consistent with [the] current known expense of health care of the parties and which [Jared] established at $411 a month.

The court also reduced Rebecca's expense for personal grooming from $949.83 per month to $500 a month. It stated,

> [Rebecca's] evidence of getting a haircut twice a year and having her nails and eye lashes done monthly to every six (6) weeks did not establish this claimed and requested expense of $11,397.96 a year for personal expenses. [Jared] did not ask for any personal grooming as part of his expenses relating to the marital standard of living[,] and he [is] not getting the $500 [Rebecca] is being awarded.

¶13 Finally, the court made several adjustments to Rebecca's claimed expenses related to savings. The court eliminated Rebecca's "[s]avings [p]lan contribution" of $2,500 per month. The court explained,

> [Rebecca] admitted that this amount was only an estimate on her part in that she thought the parties may have saved $30,000 a year. [Jared's] testimony was the parties did not contribute to any savings plan for the parties in any amount on a monthly or regular basis. Rather, the parties would save money as they had it in differing amounts and when there were sufficient funds to purchase what they wanted, the parties would spen[d] the money on cars and other purchases. No savings program was done during the marriage. In addition, [Jared] has not requested a savings plan as part of his expenses, and he is entitled to the same marital standard as [Rebecca].

The court eliminated "[r]etirement deposits" of $500 per month, stating,

> The evidence adduced at trial established the parties never saved $500 a month for retirement. Further, [Jared] did not ask for retirement as part of his expenses relating to the marital standard of living[,] giving further credibility to this fact. The evidence was any retirement amounts for the parties was only set aside and deposited in three (3) of the twenty-seven (27) years of marriage.

The court eliminated Rebecca's "additional capital/investment funds" of $7,279 monthly because "[t]he testimony and evidence established there never was any such capital or investment funds like this during the marriage. Further, no testimony was provided as to how this figure was arrived at to be claimed in the first place." The court declared that "[t]his is simply a request, which is unfounded and which the [c]ourt finds is an attempt to inflate [Rebecca's] expenses."

¶14    Rebecca now appeals.

ISSUES AND STANDARDS OF REVIEW

¶15    Rebecca presents three issues on appeal. First, she asserts that "the district court erred when it determined, on summary judgment, that Rebecca had no interest in [the] Trust." "When an appellate court reviews a district court's grant of summary judgment, the facts and all reasonable inferences drawn therefrom are viewed in the light most favorable to the nonmoving party, while the district court's legal conclusions and ultimate grant or denial of summary judgment are reviewed for correctness." *Massey v. Griffiths*, 2007 UT 10, ¶ 8, 152 P.3d 312 (cleaned up).

¶16    Second, Rebecca argues that even "if the district court's interpretation and application of Arizona law to the Trust and the Property Agreement were correct, it nonetheless abused its discretion when it refused to divide the Trust on equitable grounds." "District courts have considerable discretion concerning property distribution in a divorce[,] and we will uphold the decision of the district court unless a clear and prejudicial abuse of discretion is demonstrated." *Gerwe v. Gerwe*, 2018 UT App 75, ¶ 8, 424 P.3d 1113 (cleaned up).

¶17    Third, Rebecca contends that "the district court erred in its calculation of alimony." "A district court's award of alimony is reviewed for abuse of discretion." *Id.* ¶ 9. "Although trial courts have broad latitude in determining whether to award alimony and in setting the amount, and we will not lightly disturb a trial court's alimony ruling, we will reverse if the court has not exercised its discretion within the bounds and under the standards we have set," including if the court commits legal error. *Bjarnson v. Bjarnson*, 2020 UT App 141, ¶ 5, 476 P.3d 145 (cleaned up).

ANALYSIS

I. Rebecca's Interest in the Trust

¶18    Rebecca argues that the district court erred in ruling that she was not entitled to an equitable share of the Trust. Rebecca first asserts that the court erred in applying the 2008 Arizona Trust Code (the 2008 Code) because the 2009 Arizona Trust Code (the 2009 Code) applied retroactively and indicated that Jared's power of withdrawal gave him an ownership interest subject to transmutation under the Property Agreement. She also argues, alternatively, that even if the 2008 Code applies, Jared's interest in the Trust was marital property. Jared counters that the 2008 Code applies, that his "interest in the Trust principal was bound by a valid spendthrift provision" at the time of the Property Agreement, and that it was therefore not transferrable through the Property Agreement.

¶19    We agree with Jared and uphold the district court's decision on this issue. First, we conclude that the 2009 Code does not retroactively modify the nature of Jared's interest in the Trust at the time of the Property Agreement.[4] Even if application of the 2009 Code would have the effect Rebecca claims, we cannot apply that version of the code.

_____

4. Jared asserts that Rebecca did not preserve this issue. We do not address preservation because we resolve the issue in Jared's favor. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("If the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." (cleaned up)), *cert. denied*, 469 P.3d 718 (Utah 2021). But we note that our conclusion aligns with the district court's that "the legal position taken in [t]he Restatement (Third) of Trusts § 56 was not the law in Arizona until 2009, when it [was] partially codified as part of the [2009] Code."

¶20    Arizona law indicates that "beginning on January 1, 2009[,] . . . [the 2009 Code] applies to all trusts created before, on or after January 1, 2009." Act of Dec. 31, 2008, ch. 247 § 18(A)(1), 2008 Ariz. Sess. Laws 1179, 1179 (2nd Reg. Sess.). The parties entered the Property Agreement in March 2008. Because this date predates January 1, 2009, the 2009 Code had not taken effect at the time the parties signed the Property Agreement and therefore had no application to the Trust. Indeed, the Arizona Legislature did not leave this point ambiguous but rather included a specific provision stating that "[a]n act done before January 1, 2009[,] is not affected by this act." *Id.* Arizona caselaw has interpreted this exception to mean that the preexisting law governed until January 1, 2009. *See Favour v. Favour*, No. 1 CA-CV 13-0196, 2014 WL 546361, ¶ 30 (Ariz. Ct. App. Feb. 11, 2014) (stating that a previous statute "governs actions taken by a trustee prior to implementation of the Arizona Trust Code . . . on January 1, 2009," and that the earlier statute "recognized the trustee's investment and management authority," so "as a matter of law, [the trustee] had the authority to invest, trade, diversify, and manage trust assets prior to January 1, 2009" (cleaned up)); *In re Esther Caplan Trust*, 265 P.3d 364, 366 (Ariz. Ct. App. 2011) ("The past principal distributions are not governed by [the 2009 Code]. That statute became effective *after* the challenged distributions were made. The predecessor statute . . . merely required a trustee to keep the beneficiaries of the trust reasonably informed of the trust and its administration. The record establishes that [the appellee] complied with these relatively minimal requirements." (cleaned up)).

¶21    Accordingly, at the time the parties signed the Property Agreement, the 2008 Code was in effect. If the parties had signed the Property Agreement on, say, January 2, 2009, the 2009 Code could retroactively apply to the Trust—though it was created in 1994—to govern its terms. But because the Property Agreement was signed before the 2009 Code went into effect, the 2009 Code's retroactivity provision also had no effect. Therefore, Jared's

interest in the Trust for the sake of the Property Agreement was whatever existed under the 2008 Code, and any restrictions of the Trust as of March 2008 had full effect and were not modified by the 2009 Code. Put another way, Jared could not give an interest in property in 2008 that he did not have the right to transfer.

¶22 Under the 2008 Code, the Trust's spendthrift provision prevented Jared from transmuting his interest in the Trust into marital property.[5] The 2008 Code specified that "if [a] trust instrument provides that a beneficiary's interest in principal is not subject to voluntary or involuntary transfer, the beneficiary's interest in principal shall not be transferred." Ariz. Rev. Stat. Ann. § 14-7702(a) (2008). The Trust was subject to a spendthrift

---

5. Rebecca styles this as a potential alternative ground to affirm, but that is not accurate. While the court mostly discussed its conclusion in terms of what "amount of the Trust principal [was] due or payable within the meaning of that statute," it clearly determined that Arizona Revised Statutes section 14-7702 applied and provided—with emphasis—the language specifying that a trust not "subject to voluntary or involuntary transfer" is nontransferable. *See* Ariz. Rev. Stat. Ann. § 14-7702(a) (2008). In our view, the court ruled that the 2008 Code and the Trust's spendthrift provision prohibited Jared from transferring his interest in the Trust through the Property Agreement *and* that Jared's ability at the time to withdraw up to one-third of the principal did not render that portion (or any other) "due and payable." *See id.* § 14-7702(b). We agree with the court's application of this statute and similarly conclude that because Jared's withdrawal power relied on "the occurrence of a future event," even one "within the control of the beneficiary"— specifically, him providing a written disbursement request—the amount subject to the withdrawal power at the time of the Property Agreement was "not immediately due and payable to the beneficiary" and was therefore not available to satisfy a money judgement. *See id.*

provision, declaring that Jared lacked the "right to assign, transfer, encumber, or hypothecate his . . . interest in the principal or income of the [T]rust in any manner." Consequently, Jared's interest in the Trust was "not subject to voluntary or involuntary transfer," so his interest was not eligible for transfer. *See id.*; *see also In re Indenture of Trust Dated Jan. 13, 1964*, 326 P.3d 307, 312 (Ariz. Ct. App. 2014) ("A valid spendthrift provision *makes it impossible* for a beneficiary to make a legally binding transfer." (emphasis added) (cleaned up)).

¶23　In an effort to avoid the restrictive effect of the Trust's spendthrift provision, Rebecca argues that "[t]ransmuting property is distinct from transferring property" and therefore "Jared did not *transfer* any interest" when he allegedly transmuted his interest in the Trust through the Property Agreement. Citing *State ex rel. Industrial Commission of Arizona v. Wright*, 43 P.3d 203 (Ariz. Ct. App. 2002), Jared responds that Arizona caselaw rejects this argument:

> [In *Wright*], the court explained that the term "transfer" "includes any transaction in which a property interest was relinquished." Because transmuting a property interest from separate property to community property surrenders the transferor's entitlement to half of his or her separate property, the court reasoned, such a transmutation qualifies as a "transfer" of that property.

(Citations omitted.) Rebecca responds that the holding of *Wright* applies "only in the specific context of the Uniform Fraudulent Transfers Act."

¶24　In *Wright*, the Arizona Court of Appeals considered a premarital agreement that was fraudulently modified after a husband fell subject to a workers' compensation claim. *Id.* at 204. The modification stated that separate earnings would be community property, thus attempting to evade a judgment

against the husband's earnings. *Id.* The court held that the transmutation of the husband's earnings constituted a transfer under the Uniform Fraudulent Transfers Act:

> Before the modification, [the husband] held a sole interest in the entirety of his future earnings. The effect of the modification was to transfer that entire interest to the community. [The wife] would have a right to dispose of those earnings now dedicated to the community that she did not have when they were [the husband's] separate property. Additionally, upon dissolution of marriage, [the husband] would have surrendered all entitlement to half of those earnings. Hence, [the husband] has transferred an asset within the meaning of [the Uniform Fraudulent Transfers Act].

*Id.* at 205. While the *Wright* court did conclude that the parties' actions satisfied the broad statutory definition of a transfer under the Uniform Fraudulent Transfers Act, *see id.*, and while Rebecca is correct that the Uniform Fraudulent Transfers Act is not at issue here, the court's analysis is still useful. If we accept Rebecca's argument that the Property Agreement transmuted Jared's interest in the Trust, then—like in *Wright*—before the Property Agreement, Jared's interest in the Trust was solely his and the Property Agreement served to "transfer that entire interest to the community." *See id.* And upon divorce, Jared "would have surrendered all entitlement to half of" his interest in the Trust. *See id.* Accordingly, while we are not applying the definition of "transfer" from the Uniform Fraudulent Transfers Act, we conclude that a transmutation here would have been a transfer. In terms of the bundle of sticks formulation that Rebecca referenced in her motion for partial summary judgment, Jared would be giving Rebecca access to and an interest in whatever sticks he was

holding at the time he signed the Property Agreement—sticks that she did not previously hold.[6]

¶25 Our conclusion that Jared's purported transmutation of the Trust into marital property would have constituted a transfer is supported by the language of the Property Agreement itself. The Property Agreement indicated that "to the extent necessary, JARED and REBECCA each hereby *gives, grants, conveys and assigns to the other an interest in his or her property* . . . so as to transmute such property into the community property of JARED and REBECCA." (Emphasis added.) This language belies Rebecca's argument that the transmutation only changed the nature of—but did not affect a transfer of—Jared's interest. And this language also runs up against the language in the Trust's spendthrift provision forbidding Jared from "assign[ing], transfer[ing], encumber[ing], or hypothecat[ing] his . . . interest in the principal or income of the [T]rust in any manner." Accordingly, we agree with the district court that the Property

---

6. We need not decide what exactly Jared's interest was at the time of the Property Agreement because, no matter which property rights he then held, he would have given Rebecca an interest in only those rights.

As to the issue of any property rights he later acquired, these are also unavailable to Rebecca based on the terms of the Property Agreement. It states that "[a]ll property hereafter acquired by JARED and REBECCA, or either of them, . . . shall be deemed to be, and hereby declared to be, the community property of JARED and REBECCA" but also declares that "any property received by JARED and REBECCA by gift or inheritance after the date of this [Property] Agreement shall be the sole and separate property of the person receiving it, unless that person declares otherwise in writing." Any property interests related to the Trust that Jared received after signing the Property Agreement were "received by JARED . . . by gift or inheritance," so they are his sole and separate property.

Agreement had no effect on the Trust and that, therefore, Rebecca does not have a legally cognizable interest in the Trust.

## II. Equitable Grounds for Dividing the Trust

¶26  Rebecca contends, alternatively, that "[r]egardless of whether the Property Agreement granted Rebecca a legally cognizable interest in the Trust itself, the district court was required to consider the Trust as part of the marital property for the sake of equity." She asserts that "[d]istrict courts must equitably divide the marital estate" and quotes *Dahl v. Dahl*, 2015 UT 79, 459 P.3d 276, for the propositions that "Utah law presumes that property acquired during a marriage is marital property subject to equitable distribution" and "[t]o the extent that the Trust corpus contains marital property, Utah has a strong interest in ensuring that such property is equitably divided in the parties' divorce action." *Id.* ¶ 26. Rebecca points us to *Endrody v. Endrody*, 914 P.2d 1166 (Utah Ct. App. 1996), in which a husband's parents had established a trust after the parties were married and had named the wife as one of the beneficiaries. *Id.* at 1167–68. This court affirmed a district court's ruling that the trust assets were not available for distribution as marital assets but that the husband's shares in the trust were marital property, an equitable share of which should be placed in a constructive trust for the wife's benefit. *Id.* at 1170. Rebecca concludes, "In short, Jared's interest in the Trust was marital property. And even if the Trust assets were not available for distribution, the court was required to consider the Trust as part of the marital property for equitable purposes."

¶27  Rebecca's argument misses the mark. We have concluded, as did the district court, that Jared's interest in the Trust was not marital property or part of the marital estate subject to distribution. This is a distinct conclusion from one stating that trust funds are marital property but the trust principal is not available for distribution. Therefore, caselaw addressing

equitable distribution of trust funds that *are* marital property is inapposite. And Rebecca provides no support for the position that she should be awarded an equitable portion of the value of the Trust's principal despite a holding that she is not entitled to any portion of Jared's interest in the Trust.[7] Accordingly, we uphold the district court's decision that Rebecca is not entitled to any portion of or equivalent sum for Jared's interest in the Trust.

### III. Alimony

¶28    Rebecca next contends that the court erred in its alimony calculations when it made several deductions to Rebecca's claimed expenses. Rebecca insists that she "does not raise *a factual* challenge" but instead "challenges the district court's method of reduction and justification for doing so." She asserts that the district court "misconstrued Utah law" when it adjusted her expenses.

¶29    Under Utah law, courts must consider in alimony determinations the factors listed in Utah Code section 30-3-5, including "(i) the financial condition and needs of the recipient spouse; (ii) the recipient's earning capacity or ability to produce income, including the impact of diminished workplace experience resulting from primarily caring for a child of the payor spouse; [and] (iii) the ability of the payor spouse to provide support." Utah Code § 30-3-5(10)(a); *see also Jones v. Jones*, 700 P.2d 1072, 1075

---

7. Rebecca also makes a similar argument under a contract law theory: that the court should enforce the parties' binding contract to transmute the Trust through the Property Agreement. This argument fails for a reason analogous to her equity argument— she is wrong that Jared contracted to transmute his interest in the Trust into marital property because the Trust's spendthrift provision prevented him from doing so. Therefore, there was no binding contract for the court to enforce, and her argument on this point is similarly unavailing.

(Utah 1985); *English v. English*, 565 P.2d 409, 411–12 (Utah 1977). "An alimony award should also advance, as much as possible, the primary purposes of alimony." *Rule v. Rule*, 2017 UT App 137, ¶ 14, 402 P.3d 153 (cleaned up). Alimony is intended "(1) to get the parties as close as possible to the same standard of living that existed during the marriage; (2) to equalize the standards of living of each party; and (3) to prevent the recipient spouse from becoming a public charge." *Jensen v. Jensen*, 2008 UT App 392, ¶ 9, 197 P.3d 117 (cleaned up).

¶30 We have previously explained,

> Alimony is not limited to providing for only basic needs but should be fashioned in consideration of the recipient spouse's station in life in light of the parties' customary or proper status or circumstances, with the goal being an alimony award calculated to approximate the parties' standard of living during the marriage as closely as possible.

*Rule*, 2017 UT App 137, ¶ 14 (cleaned up); *see also Davis v. Davis*, 749 P.2d 647, 649 (Utah 1988) ("The ultimate test of the propriety of an alimony award is whether, given all of these factors, the party receiving alimony will be able to support him- or herself as nearly as possible at the standard of living enjoyed during marriage." (cleaned up)); *Savage v. Savage*, 658 P.2d 1201, 1205 (Utah 1983) ("One of the chief functions of an alimony award is to permit the parties to maintain as much as possible the same standards after the dissolution of the marriage as those enjoyed during the marriage."). And "in terms of alimony, the marital standard of living analysis is about whether the parties' proposed points of calculation are *consistent* with the parties' manner of living and financial decisions (i.e., the historical allocation of their resources)." *Mintz v. Mintz*, 2023 UT App 17, ¶ 24, 525 P.3d 534, *cert. denied*, 523 P.3d 730 (Utah 2023).

A.     Home Maintenance

¶31    Rebecca alleges that the district court improperly reduced her claimed expenses related to home maintenance, including expenses for snow removal, pool and spa maintenance, and landscaping. She argues that Jared took care of these tasks during the marriage and she should now be compensated for the cost of hiring other individuals to accomplish these tasks. In her words, "Rebecca's marital standard of living was that someone else did the pool maintenance, snow removal, and landscaping. Since that person has moved out, she is left without the standard of living to which she was accustomed."

¶32    Rebecca's argument on this point is fatally flawed. A court's inquiry in evaluating historical expenses to determine alimony involves the *marital* standard of living—not a separate standard of living for each person within the marriage. *See Davis*, 749 P.2d at 649 (describing "the standard of living enjoyed during marriage" (cleaned up)); *Rule*, 2017 UT App 137, ¶ 14 (considering "the parties' standard of living during the marriage" (cleaned up)); *Jensen*, 2008 UT App 392, ¶ 9 (discussing the "standard of living that existed during the marriage" as one but the "the standards of living of each party" after divorce as two (cleaned up)). The marital standard of living is that which the parties *shared*, and courts consider the parties as a single unit when evaluating that standard. We can only imagine the chaos that would ensue if divorcing partners could expense every task their former spouses previously performed.[8] Instead, we reemphasize

---

8. The absurdity of this position is evident by a scenario in which a spouse who has dedicated years to primarily raising children and earns less than the other spouse is penalized upon divorce by the higher-earning spouse expensing many tasks related to childcare and home maintenance that the lesser-earning spouse previously shouldered without pay. In such scenarios, higher-

(continued…)

that "in terms of alimony, the marital standard of living analysis is about whether the parties' proposed points of calculation are *consistent* with the parties' manner of living and financial decisions (i.e., the historical allocation of their resources)." *Mintz*, 2023 UT App 17, ¶ 24. Rebecca admits that the couple did not historically allocate funds to these expenses while the parties were married, so they cannot be considered part of the marital standard of living. And the court found as much, stating, "[t]he parties never paid for snow removal during the marriage[,] and this expense was not part of the marital [lifestyle]"; "[t]he parties did not have pool maintenance expense[s] during the marriage as the pool was maintained by the parties"; and landscaping "was not an expense that was incurred during the marriage as the yard work was done by the parties themselves." Therefore, the court was correct in reducing Rebecca's claims for these categories when calculating her expenses for the sake of alimony.[9]

---

earning spouses could effectively lower their alimony burdens to the detriment of lesser-earning spouses without any remuneration for the work that previously went unpaid.

9. Even so, the court did erroneously discuss factors it should not have considered in its findings on these issues. For the pool maintenance expenses, the court stated that Rebecca was "not cleaning the pool despite acknowledging she is capable of doing so," and for landscaping expenses the court declared that Rebecca "further acknowledged that she is capable of yard work." Whether Rebecca was capable of taking on these tasks is irrelevant to the question of whether their expenses were part of the marital standard of living.

Even more problematic, the court stated, "Also, [Jared] has not requested that he [have] third parties do his yard maintenance." This thinking—that one party's claimed expenses should determine the permissible scope of the other party's—is

(continued…)

¶33　However, Rebecca did provide evidence that the parties had historically paid some amount for bark replacement and lawn aeration. In a financial declaration, she listed a monthly expense of $126.66 for "[b]ark for the year," and she indicated that "[t]his [was] based on an actual historical expense of $3,040.00 every 2 years." She also listed a monthly expense of $5 for aerating and stated that "[t]his [was] based on an actual historical expense of $30 paid twice per year." Additionally, she testified that the parties had historically replaced bark and that doing so was "quite costly."[10] Jared, in a memorandum submitted to the court, admitted that bark was an expense that the parties had previously paid and did not contest the aerating expense. Therefore, the costs associated with bark replacement and lawn aeration were part of the marital standard of living such that they were not properly

---

improper and, frankly, dangerous. We discuss our concerns with such an approach below. *See infra* ¶ 43. But ultimately the court's actions of reducing Rebecca's expenses for each of these categories was not an abuse of discretion because the court also—correctly—found that each claimed expense was not part of the parties' marital standard of living.

10. It appears that the court lumped these expenses in with landscaping. Rebecca completed a financial declaration on January 31, 2019, that included itemized expenses for bark, lawn aeration, and landscaping. These three expenses combined added up to $414.66. A financial declaration that Rebecca submitted on October 22, 2020, listed an expense for "[l]andscaping, aerating, [and] bark" of $414.66 per month. The court addressed only landscaping in its findings, not mentioning aeration or bark. The court's failure to consider these distinct, historical expenses constitutes an abuse of discretion. *See Bjarnson v. Bjarnson*, 2020 UT App 141, ¶ 5, 476 P.3d 145. As to the remaining $283 per month that is rightly attributed to landscaping alone, this is not a marital expense.

excluded from consideration in the court's alimony calculations. Accordingly, because the facts are otherwise undisputed on this issue, we reverse on this point and instruct the court to enter expenses for Rebecca of $5 per month for lawn aeration and $126.66 per month for bark replacement.

B.    Health and Personal Care

1.    Health Insurance

¶34    Rebecca asserts that the district court abused its discretion in reducing her claimed expense for health insurance. At trial, she informed the court that she was still on Jared's family's health insurance plan but explained her claimed cost of $757 monthly: "This was a quote that I sought out. . . . It does not have any deductible. . . . [H]istorically our deductible [was] put on an HSA card that was covered by the Knight Group." Both parties agreed that the historical deductible, which had been paid by the Knight Group, was around $8,000.

¶35    The court reduced Rebecca's health insurance expense to $411 per month, the number Jared gave as the historical amount the parties paid for health care services through an HSA card. The court explained, "[N]o written evidence was provided as to the costs for health care coverage for [Rebecca]. [Rebecca] acknowledged the $757 was for a policy with no deductibles[,] which is not the same level of policy the parties currently have in place, which has [an] $8,000 a year deductible." The court indicated that its adjustment was "consistent with current known expense[s] of health care of the parties and which [Jared] established at $411 a month."

¶36    This conclusion was in keeping with the court's determination that monetary support from the Knight family qualified as gifts and could not be considered in determining the marital standard of living or the parties' expenses. It noted, "[I]n this case . . . a large portion of these things the parties were

enjoying was the result of the generosity and the benefits of others. When there's . . . no guarantee or no requirement to have those additional funds come in . . . to have this lifestyle, you know, they're not going to be able to have it." The court again said, "You can't count gifts . . . that were given at the discretion of other individuals to say you're entitled to continue to receive those gifts and have those funds coming in to you to maintain a standard of living that you may have [had] when you received those gifts . . . ."

¶37 The court's stance on this issue is correct: the gifts from Jared's family, despite being a regular feature of the marriage, may not be properly considered in calculating Rebecca's needs or Jared's ability to pay alimony. *See* Utah Code § 30-3-5(10)(a). The alimony factors refer only to the finances of the spouses, not those of outside parties. *Id.*; *see also Jones v. Jones*, 700 P.2d 1072, 1075 (Utah 1985). Additionally, we have enunciated previously that past gifts are not to be considered in the alimony calculus: "[T]he court could not base its prospective order on past gifts that have no assurance of being continued because [a donor] has no legal obligation to continue providing the monetary support that she has in the past." *Issertell v. Issertell*, 2020 UT App 62, ¶ 26, 463 P.3d 698.

¶38 Accordingly, the court did not abuse its discretion when it determined that Rebecca did not provide qualifying evidence of her future health insurance expenses because she submitted only a quote for a plan without a deductible. The parties both testified that they had a deductible during the marriage, and Rebecca is not entitled to a health insurance plan better than the one the parties had during the marriage. The fact that the parties' deductible was historically paid by the Knight Group does not impact our analysis because those payments were "past gifts that have no assurance of being continued because [the Knight Group] has no legal obligation to continue providing the monetary support that [it] has in the past." *See id.* And without evidence

from Rebecca on which it could rely, the court did not abuse its discretion in accepting the amount Jared put forth as the parties' historical health insurance cost.[11] *See Sauer v. Sauer*, 2017 UT App 114, ¶ 10, 400 P.3d 1204 ("Once the court determined that there was no evidence that was both credible and relevant regarding [the recipient spouse's] reasonable housing needs, it was appropriate for the court to impute a reasonable amount based on other evidence provided by the parties. . . . We therefore see no impropriety in the trial court's decision to impute housing needs to [the recipient spouse] in the same amount as [the payor spouse] had claimed was reasonable . . . ."). We affirm on this point.

2.      Personal Grooming

¶39     Rebecca also asserts that the court abused its discretion in reducing Rebecca's claimed expense for "personal grooming." The court stated that it was "reduc[ing] personal grooming by $449.83, from $949.83 to $500 a month," because Rebecca's

---

11. However, we note that it was improper for the court to consider evidence from sources outside the record on this topic. The court indicated that it "ha[d] received evidence in other cases that health care coverage for a single person can be obtained in the $400 to $500 a month range." Evidence beyond this case is irrelevant to determining the parties' historical expenses or their marital standard of living. *See Mintz v. Mintz*, 2023 UT App 17, ¶ 24, 525 P.3d 534 ("The marital standard of living analysis is about whether *the parties'* proposed points of calculation are consistent with *the parties'* manner of living and financial decisions (i.e., the historical allocation of *their* resources).") (cleaned up) (emphasis added)). And, as we discuss below, the amount that is reasonable for different parties' expenses varies according to the circumstances unique to each divorcing couple's lifestyle. But because the court ultimately based its finding for health insurance on the figure Jared submitted, this errant comment does not constitute an abuse of discretion.

"evidence of getting a haircut twice a year and having her nails and eye lashes done monthly to every six (6) weeks did not establish this claimed and requested expense of $11,397.96 a year for personal expenses." The court also stated that Jared "did not ask for any personal grooming as part of his expenses relating to the marital standard of living[,] and he was not getting the $500 [Rebecca was] being awarded."

¶40   Rebecca takes issue with the court's findings and reasoning, asserting,

> [T]his was not the evidence. She testified that she gets her eyelashes and nails done every two weeks, not "monthly to every six (6) weeks." She testified that in addition to getting her hair cut, she also gets a perm. She testified that she gets a full body wax. She also testified that she has costs for "toenails." She also testified that she has "maintenance" costs. She stated that to reach this number she "went through [her] credit card statements and added up for a year's worth of" these expenses. She testified that "obviously this is historically . . . what I spent."
>
> Opposing counsel did not dispute Rebecca's expenses, but simply opined that he thought "the maximum would be . . . $500 a month. $6000 a year for personal grooming is quite a nice budget." But what opposing counsel thinks qualifies as "quite a nice budget" is not the test in Utah. Instead, the test is the marital standard of living, and Rebecca's testimony—unchallenged by contrary evidence—was that she spent $949.83 per month.
>
> Second, the district court reduced Rebecca's personal grooming expenses because Jared "did not ask for any personal grooming as part of his expenses relating to the marital standard of living

and he was not getting the $500 [Rebecca] is being awarded." That is irrelevant. If Jared spends nothing on personal grooming, or if he has no monthly expenses because the Knight family pays for them all, that does not mean that Rebecca's estimated expenses are inaccurate.

¶41 We agree with Rebecca on all fronts. The court would have acted within its discretion if it had found Rebecca's evidence unreliable or had determined that Rebecca's claimed expenses were unreasonable in light of the couple's marital standard of living. *See Woolums v. Woolums*, 2013 UT App 232, ¶ 10, 312 P.3d 939 ("The district court's evaluation of and reliance on [one spouse's] testimony, along with its own determinations of the reasonableness of the claimed expenses, fell squarely within its broad discretion to determine an appropriate alimony award."). But that is not what it did. It disregarded Rebecca's evidence of historical spending and substituted a figure provided by Jared's counsel with no evidentiary basis. Jared's counsel's thoughts on what makes "quite a nice budget" are irrelevant. The court's inquiry should have been rooted in Rebecca and Jared's marital standard of living, as indicated by their historical spending. *See Mintz v. Mintz*, 2023 UT App 17, ¶ 24, 525 P.3d 534, *cert. denied*, 523 P.3d 730 (Utah 2023).

¶42 A court's inquiry into the marital standard of living must evaluate the specific circumstances of that couple, and expenses that are unreasonable in light of one couple's marital standard of living may be reasonable in light of another couple's marital standard of living. "Indeed, we have explained that alimony is not limited to providing for only basic needs but should be fashioned in consideration of the recipient spouse's station in life in light of the parties' customary or proper status or circumstances." *Rule v. Rule*, 2017 UT App 137, ¶ 14, 402 P.3d 153 (cleaned up). And "the goal" of the inquiry is "an alimony award calculated to approximate the parties' standard of living during the marriage

as closely as possible." *Id.*; *see also Davis v. Davis*, 749 P.2d 647, 649 (Utah 1988) ("The ultimate test of the propriety of an alimony award is whether, given all of these factors, the party receiving alimony will be able to support him- or herself as nearly as possible at the standard of living enjoyed during marriage." (cleaned up)); *Savage v. Savage*, 658 P.2d 1201, 1205 (Utah 1983) ("One of the chief functions of an alimony award is to permit the parties to maintain as much as possible the same standards after the dissolution of the marriage as those enjoyed during the marriage."). Rebecca testified that the marital standard of living included significant spending on her personal grooming. The court acted improperly when it discarded this evidence and substituted another amount without properly concluding that Rebecca's evidence was inadequate or her expenses were unreasonable in light of the marital standard of living.

¶43 It was also improper for the court to base its determination, in part, on Jared's lack of submission for this budget line item. There is no need for courts to limit one party's expenses to those the other party also claims. *See* Utah Code § 30-3-5(10)(a) (including as a factor in determining alimony "the financial condition and needs of the recipient spouse"). In fact, doing so increases the risk of gamesmanship between the parties. There is already a risk that divorcing spouses may inflate their claimed expenses in an effort to sway the alimony calculation in their favor: payor spouses might attempt to minimize their ability to provide support by claiming high expenses, while recipient spouses might inflate their expenses to claim that their needs are great. *See id.* But limiting a recipient spouse's potential expenses to only those categories claimed by the payor spouse dangerously alters this already-thorny calculation. In situations where a payor spouse's ability to pay is unlikely to be an issue, the payor spouse would face a significant incentive to omit many expenses and thereby drastically reduce the receiving spouse's needs. But the danger is not just in these situations. In any case, a payor spouse would be incentivized to identify categories for which the

recipient spouse would likely have higher expenses and omit those. In other words, payor spouses could significantly undercut alimony awards by strategically omitting expenses. Accordingly, we caution courts not to apply such faulty reasoning when calculating alimony. Instead, courts should base their findings on expenses that are reasonable in light of the couple's unique marital standard of living. *See Mintz*, 2023 UT App 17, ¶ 24.

¶44 On this front, we clarify that a couple's marital standard of living may include disparate spending by the parties on various categories during the marriage. Throughout the marriage, one spouse may spend more—even significantly more—than the other on personal grooming, entertainment, travel, or any number of other expense categories. A partner may embrace the age-old adage's modernized mantra of "happy spouse, happy house," may derive independent pleasure from a spouse's purchases, or may observe a spouse's spending habits—whether for monthly follicle support treatments or Jazz tickets only one spouse actually uses—through gritted teeth. But for the sake of calculating alimony, we assume that the parties agreed on their household expenditures such that whatever was historically spent by the parties during the marriage constitutes the couple's marital standard of living, even if the spending was lopsided—or, indeed, one-sided—within a given expense category. *See Davis*, 749 P.2d at 649; *Rule*, 2017 UT App 137, ¶ 14. Consequently, whether Jared truly spent nothing on personal grooming historically or he simply elected to omit his expenses in that category, the court erred in limiting its acceptance of Rebecca's personal grooming expenses based on Jared's lack of submission.

¶45 The court abused its discretion when it applied the wrong legal standard to Rebecca's claimed expenses for personal grooming. Because the court did not find Rebecca's evidence unreliable or determine that Rebecca's claimed expenses were unreasonable in light of the couple's marital standard of living, we reverse its decision on this point and instruct it to modify its

findings to include the $949.83 per month consistent with the parties' marital standard of living.

C.      Savings and Other Funds

1.      Savings Plan

¶46     Rebecca asserts that the court wrongfully entirely rejected her expense for a "[s]avings [p]lan" of $2,500 per month. First, she points to the court's statement that "[Jared] has not requested a savings plan as part of his expenses, and he is entitled to the same marital standard as [Rebecca]." As we have discussed, such a consideration has no place in the alimony analysis under Utah law. Additionally, the court summarized the evidence related to a savings plan:

> [Rebecca] admitted that this amount was only an estimate on her part in that she thought the parties may have saved $30,000 a year. [Jared's] testimony was the parties did not contribute to any savings plan for the parties in any amount on a monthly or regular basis. Rather, the parties would save money as they had it in differing amounts and when there were sufficient funds to purchase what they wanted, the parties would spen[d] the money on cars and other purchases.

From this, the court concluded that "[n]o savings program was done during the marriage." But in so concluding, the court misapplied Utah law on this subject.

¶47     In *Mintz v. Mintz*, 2023 UT App 17, 525 P.3d 534, *cert. denied*, 523 P.3d 730 (Utah 2023), we considered a similar question of whether "the district court erred in excluding from the alimony award an amount reflective of historical investment" where a couple had a habit of investing money "essentially as savings." *Id*. ¶¶ 2, 16. There, the parties' testimonies established that "[b]efore

2014, they made deposits into investment accounts 'when money was left over after normal marital spending,' and after 2014, they made direct deposits into investment accounts as part of [the husband's] employment." *Id.* ¶ 2. We reiterated that, in situations like these, "[t]he critical question is whether funds for post-divorce savings, investment, and retirement accounts are necessary because contributing to such accounts was *standard practice* during the marriage and helped to form the couple's *marital standard of living*." *Id.* ¶ 17 (quoting *Bakanowski v. Bakanowski*, 2003 UT App 357, ¶ 16, 80 P.3d 153). We noted that "when the *Bakanowski* court provided the test for appropriate consideration of savings, investment, and retirement accounts in alimony calculations, it cited" another case "in which the court reasoned that because the parties had made *regular savings deposits*, including savings in the alimony award could help maintain the recipient spouse's marital standard of living." *Id.* ¶ 18 (cleaned up). Then we clarified that "an event must certainly be recurring but need not be uniformly systematic to be considered 'regular.' Indeed, something can be done 'regularly' if done whenever the opportunity arises, though the actual time sequence may be sporadic." *Id.* ¶ 19 (cleaned up). So, we explained,

> Even if savings deposits and investments do not occur on an exact timetable, such marital expenditures can be considered a standard practice in those infrequent and unusual circumstances where a party can produce sufficiently persuasive evidence that savings deposits and investments were a recurring marital action whenever the opportunity arose, though the actual time sequence may be sporadic.

*Id.* ¶ 20 (cleaned up). And we concluded that the parties' testimonies that they made substantial deposits into investment accounts "at least annually" "established that the parties followed

a regular pattern, i.e., a standard practice, of investing a portion of their annual income." *Id.* ¶ 21 (cleaned up).

¶48 We then considered the question of whether the parties' standard practice of investing contributed to their marital standard of living, because "to justify an alimony award that includes an amount for investment, the parties' acts of investing must also contribute to the 'marital standard of living.'" *Id.* ¶ 22 (quoting *Bakanowski*, 2003 UT App 357, ¶ 16). We concluded that the parties' standard practice of investing did contribute to their marital standard of living, so we remanded "the case to the district court to recalculate alimony based on the amount that the couple's historical investment contributed to the marital standard of living." *Id.* ¶ 28. The same is true for savings: a court must determine whether a couple's standard practice of saving contributed to their marital standard of living to incorporate savings into an alimony award. *See id.*

¶49 Here, such a conclusion is less apparent from the district court's findings than was true in *Mintz*. The court's description of Rebecca's testimony of annual savings and of Jared's testimony that the parties would save to fund large purchases certainly suggests that savings may have been a standard practice during the marriage that contributed to the marital standard of living. *See id.* ¶¶ 20–22; *Bakanowski*, 2003 UT App 357, ¶ 16; *Kemp v. Kemp*, 2001 UT App 157U, paras. 3–4. But the court's findings regarding the regularity of the couple's savings habits are insufficient for us to hold that this standard is clearly met. Still, the court's conclusion that "[n]o savings program was done during the marriage" does not clearly follow from its other findings, given our caselaw on this topic. The court's focus strictly on monthly savings habits is myopic and at odds with precedent, and the court provides no explanation for its interpretation of Jared's testimony that the parties did not save on a "regular basis." Therefore, we conclude that the court exceeded its discretion on this matter insofar as it applied the incorrect legal standard. *See*

*Bjarnson v. Bjarnson*, 2020 UT App 141, ¶ 5, 476 P.3d 145 ("We will reverse [an alimony award] if the court has not exercised its discretion within the bounds and under the standards we have set . . . ." (cleaned up)). We remand this matter for the court to make additional findings as to the regularity of the parties' savings deposits. On remand, "the court should, as a legal matter, ensure it employs the correct legal definitions of standard practice and marital standard of living, apply the facts of [this] case to those definitions, and then determine whether the facts as found meet the criteria for a savings-based alimony award." *Mintz*, 2023 UT App 17, ¶ 17.

2.    Retirement

¶50    Rebecca also asserts that the court erred in entirely rejecting her submitted expense for "[r]etirement deposits" of $500 per month. The court explained that "[t]he evidence adduced at trial established the parties never saved $500 a month for retirement. . . . The evidence was any retirement amounts for the parties was only set aside and deposited in three (3) of the twenty-seven (27) years of marriage." The court again improperly discussed the point that "[Jared] did not ask for retirement as part of his expenses relating to the marital standard of living," but rather than relying on this point to deny Rebecca's claim for a retirement savings provision in the alimony award, the court stated that this point gave "further credibility to th[e] fact" that the parties did not regularly save for retirement. More importantly, and unlike for the savings category, the court's conclusion that there was no standard practice of saving for retirement flows from its findings on the irregularity of the parties saving for retirement while married.

¶51    Furthermore, Rebecca does not argue on appeal that the court applied the wrong legal standard here. She explains that Jared did not submit a retirement expense because he "is worth literally millions of dollars and Rebecca, when she was married,

also anticipated having millions of dollars available for retirement." She argues that "[t]o even come close to approximating the marital standard of living, Rebecca must start to save for retirement." But this is not in line with our caselaw. Again, we look to the parties' "historical allocation of their resources" to determine their marital standard of living, *id.* ¶ 24, and Rebecca does not argue that the parties historically allocated their resources by saving regularly for retirement. Therefore, the court did not abuse its discretion in determining that saving for retirement was not a feature of the marital standard of living and, accordingly, removing that claimed expense when calculating alimony. We affirm on this point.

3.      Additional Capital/Investment Funds

¶52    Finally, Rebecca contends that the court was wrong to reject her expense for "additional capital/investment funds" of $7,279 monthly. The court did so because "[t]he testimony and evidence established there never was any such capital or investment funds like this during the marriage. Further, no testimony was provided as to how this figure was arrived at to be claimed in the first place." The court declared that "[t]his is simply a request, which is unfounded and which the [c]ourt finds is an attempt to inflate [Rebecca's] expenses." Rebecca argues on appeal that this "is incorrect" and that her "[f]inancial [d]eclaration provide[d] a detailed explanation of how the figure was computed: 'This is an amount based on funds the parties historically had available from [Jared's] family wealth for discretionary investments . . . .'" This argument does not prevail. As we have explained, past gifts are excluded from the alimony calculus. *See Issertell v. Issertell*, 2020 UT App 62, ¶ 26, 463 P.3d 698. The funds that were historically available for investment were gifts, and as such, they are not properly considered as a standard practice contributing to the marital standard of living. *See id.*; *Mintz*, 2023 UT App 17, ¶¶ 20–22. Therefore, the court was acting

within its discretion as to this item, and we affirm its decision in this respect.

## CONCLUSION

¶53     The district court did not err in determining that Rebecca had no interest in the Trust, and it did not abuse its discretion in deciding against dividing the Trust on equitable grounds. We affirm in this respect.

¶54     As to alimony, the court exceeded its discretion when it applied the wrong legal standard when calculating several of Rebecca's expenses. Accordingly, we reverse the court's decision with respect to Rebecca's personal grooming expenses and the expenses associated with lawn aeration and bark replacement. We also remand the matter for further factual findings as to the regularity of the parties' savings deposits and a determination of whether, applying the law correctly, the parties' savings habits constituted a standard practice contributing to the marital standard of living. We affirm the remainder of the court's alimony determinations.

_____